992 So.2d 446 (2008)
MEYER & ASSOCIATES, INC.
v.
COUSHATTA TRIBE OF LOUISIANA.
No. 2007-CC-2256.
Supreme Court of Louisiana.
September 23, 2008.
Rehearing Denied November 10, 2008.
*447 Carleton, Dunlap, Olinde, Moore & Bohman, Richard Phillip Ieyoub, James Elwood Moore, Jr., Baton Rouge, Modrall, Sperling, Roehl, Harris & Sisk, Lynn H. Slade, Pro Hac Vice, for applicant.
Vilar & Elliott, Charles D. Elliott, Alexandria, Aaron L. Green, for respondent.
*448 TRAYLOR, J.
We granted this writ application to determine whether the court of appeal erred in reversing the judgment of the trial court. For the reasons which follow, we reverse the ruling of the court of appeal and reinstate the judgment of the trial court.

FACTS and PROCEDURAL HISTORY
In December of 2001, the Coushatta Tribe of Louisiana ("CTOL" or "the Tribe"), a federally recognized Indian Tribe, entered into an "Agreement for Professional Services" with Meyer and Associates, Inc. ("Meyer"), for general engineering and construction services. This contract, signed by Lovelin Poncho, then the Chairman of the Coushatta Tribal Council, provided that the contract would be governed by the laws of the State of Louisiana, that any disputes would be settled by binding arbitration according to the rules of the American Arbitration Association, and that the arbitration would be enforced in the Tribal Court.
Some time later, Meyer and the Tribe decided to jointly develop an electric power plant. The development, as contemplated, would involve major financial investments from businesses, cooperatives, and municipalities. On January 14, 2003, the Tribal Council passed Resolution 2003-04, authorizing the Chairman to negotiate and execute all necessary agreements with Meyer as may be required to enable the complete development and implementation of the power program, as well as to negotiate and execute necessary memorandums of agreement (MOA) with various companies and municipalities as may be necessary to develop and implement the program. R. at 98-105.
During the same period of time, the Tribe, through Chairman Poncho, and Meyer entered into an "Interim and Definitive Supplemental Agreement to Existing Agreement for CTOL Power Program," which modified the original "Agreement for Professional Services." This interim agreement was executed "with Effective Date of CTOL Resolution 2003-04 or January 14, 2003." R. at 114. The interim agreement stated, among other things, that the two agreements and "amendments thereto shall be interpreted, governed and construed under the laws of the State of Louisiana without regard to applicable conflict of laws provisions," that the Tribe "irrevocably consent[ed] to the jurisdiction of the courts of the State of Louisiana," that "any dispute arising hereunder shall be heard by a court of competent jurisdiction in the Parish of Allen, or any other Parish mutually agreed to," and that the "CTOL, specifically waives any rights, claims, or defenses to sovereign immunity it may have as it relates to this Agreement except this waiver is limited at this time to Development Phase 2 Services." R. at 113-14.
Between April and September 2003, the Tribe executed memorandums of understanding (MOU) with Valley Electric Membership Cooperation ("Valley") and the cities of Natchitoches, Minden, and Ruston, Louisiana. The Valley MOU contained a forum selection clause agreeing that disputes would be litigated in a court of competent jurisdiction in Natchitoches Parish, Louisiana, and a waiver of the Tribe's sovereign immunity. The remaining MOU's contained similar forum selection clauses indicating that disputes would be litigated under the laws of the State of Louisiana in courts of competent jurisdiction in appropriate venues, as well as waivers of sovereign immunity.
In June of 2005, the Tribe elected a new Tribal Council and Chairman.
On April 21, 2006, the Tribe filed suit in Tribal Court against Meyer for damages *449 related to the various contracts. On June 9, 2006, Meyer filed suit against the Tribe in the Fourteenth Judicial District Court for breach of contract. On July 7, 2006, the Tribe filed Exceptions of Lis Pendens and Lack of Subject Matter Jurisdiction in the district court. The district court denied the Exception of Lis Pendens on October 31, 2006, and on November 6, 2006, the district court denied the Exception of Lack of Subject Matter Jurisdiction. On August 8, 2007, the court of appeal applied the federal exhaustion of tribal remedies doctrine and stayed the matter, determining that the district court should have allowed the Tribal Court the opportunity to decide whether the Tribe had waived its sovereign immunity. This Court granted writs in order to determine the propriety of the court of appeal's ruling.

DISCUSSION
The issues before the Court are twofold: (1) Whether the district court should have stayed this matter in accordance with the exhaustion of tribal remedies doctrine in order to allow the Tribal Court to decide whether the Tribe had waived its sovereign immunity, and (2), if not, whether the Tribe waived its sovereign immunity such that it was amenable to suit in the district court.
The exhaustion of tribal remedies doctrine is a jurisprudential rule developed by the federal courts in order to promote tribal sovereignty. The doctrine holds that when federal and tribal courts have concurrent jurisdiction, or when a tribal court has even a "colorable claim" of jurisdiction, federal courts will afford the tribal courts the opportunity to first determine their jurisdiction. Ninigret Development Corp. v. Narragansett Indian Wetuomuck Housing Authority, 207 F.3rd 21, 28 (1st Cir.2000).
As ably explained by the court of appeal in this matter:
The federal government favors and encourages tribal self-government, and in furtherance of these policies, the Supreme Court has held that a tribe whose jurisdiction has been challenged should have the first opportunity to determine the validity of such a challenge. In Iowa [Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) ], the Court stated, "[r]egardless of the basis for jurisdiction, the federal policy supporting tribal self-government directs a federal court to stay its hand in order to give the tribal court a `full opportunity to determine its own jurisdiction.'" This policy favors abstention by non-tribal courts to allow self-government and self-determination by Indian tribes of which tribal courts play an important role. The policy allows tribal courts to be the first to respond to an invocation of a challenge to their jurisdiction. It is prudential not jurisdictional. Therefore, it does not establish adjudicatory authority over lawsuits filed in tribal courts. A tribal court's determination that it had jurisdiction is reviewable after tribal remedies have been exhausted.
* * *
Being a prudential rule, the doctrine is applied as a matter of comity. Comity is a discretionary policy where "the courts of one state give effect to the laws of another state or extend immunity to a sister sovereign not as a rule of law but rather out of deference or respect. Courts extend immunity as a matter of comity to foster cooperation, promote harmony, and build goodwill." Unless there is an abuse of discretion by the trial court, the decision not to extend comity should not be overturned.
*450 Meyer and Assoc., Inc. v. Coushatta Tribe of Louisiana, XXXX-XXXX (La.App. 3 Cir. 8/8/07) 965 So.2d 930, 934-5.
As related by the court of appeal, the United States Supreme Court has never held that the exhaustion of tribal remedies doctrine applies to the states. If we assume that the doctrine does apply to state courts, it is axiomatic that the jurisdiction of the state court must be determined prior to the doctrine's application. The doctrine applies only when a federal court (or hypothetically, here, a state court) and a tribal court share jurisdiction. The doctrine mandates that a court with jurisdiction allow a tribal court which may have jurisdiction to determine its own jurisdictional question. If a state or federal court did not have jurisdiction, there would be no need to apply the doctrine. Instead, the state or federal court would decline to proceed with the case based on lack of subject matter jurisdiction. In any event, the doctrine does not mandate that tribal courts be allowed to determine whether or not non-tribal courts have concurrent jurisdiction.
Our determination that state courts are the arbiters of their own jurisdiction is bolstered by previous holdings by courts of appeal in this State. In Ortego v. Tunica Biloxi Indians of Louisiana d/b/a Paragon Casino, 03-1001 (La.App. 3 Cir. 2/4/04), 865 So.2d 985, writ denied, 04-587 (La.4/23/04), 870 So.2d 306, the court of appeal determined that the trial court did not have jurisdiction over the matter because there was no valid waiver of sovereign immunity rather than because of the tribal exhaustion doctrine. Likewise, in the case of Bonnette v. Tunica-Biloxi Indians, 02-919, 02-920, 02-921 (La.App. 3 Cir. 5/28/03), 873 So.2d 1, the court of appeal dismissed the suit due to the lack of a valid waiver of sovereign immunity.
For these reasons, the district court did not err in entertaining the issue of whether or not it had subject matter jurisdiction, and because the issue of the district court's subject matter jurisdiction revolved around whether the Tribe had validly waived its sovereign immunity, the district court did not err in declining to defer to the Tribal Court on that issue.
With regard to the waiver, an Indian tribe is subject to suit in state courts only where Congress has authorized the suit or the tribe has waived its immunity. Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., 523 U.S. 751, 754, 118 S.Ct. 1700, 1702, 140 L.Ed.2d 981 (1998). Congress' authorization for suit must be unequivocal and a tribe's waiver must be clear. C & L Enterprises, Inc. v. Citizen Band of Potawatomi Indian Tribe of Oklahoma, 532 U.S. 411, 418, 121 S.Ct. 1589, 1594, 149 L.Ed.2d 623 (2001).
Meyer has not asserted that Congress authorized the suit, rather its argument is that the Tribe unequivocally waived its immunity to the suit by means of the forum selection clauses contained in the various contracts between the parties and in the MOU's between the Tribe and the municipalities. There is no doubt that the language contained in the forum selection clauses would suffice to waive the Tribe's sovereign immunity, if the clauses are valid. The Tribe argues, however, that Chairman Poncho did not have the authority to waive the Tribe's sovereign immunity because, according to Tribal law, its sovereign immunity could only be waived by means of a Tribal Resolution or ordinance, and that no such resolution or ordinance was passed by the Tribal Council.
The Tribe relies on the following language contained in its Tribal Law:
The Coushatta Tribe of Louisiana, as a sovereign government, is absolutely immune from suit, and its Tribal Counsel, *451 judges, Appellate Judges, ad-hoc Judges, officers, agents, and employees shall be immune from any civil or criminal liability arising or alleged to arise from their performance or non-performance of their official duties. Nothing in this Code shall be deemed to constitute a waiver of the sovereign immunity of the Coushatta Tribe of Louisiana except as expressly provided herein or as specifically waived by a resolution or ordinance approved by the Tribal Counsel specifically referring to such.
Title 1, § 1.1.05 of the Coushatta Judicial Code.
Meyer argues that the language of § 1.1.05 makes clear that the section does not apply to the waivers in question, but instead clarifies simply that "nothing in this [Judicial] Code" should be construed as waiving the Tribe's sovereign immunity absent a resolution or ordinance so stating, and that the Tribe's sovereign immunity naturally extends to its judicial officers.
It is a well-settled principle of statutory construction that absent clear evidence of a contrary legislative intention, a statute should be interpreted according to its plain language. Cleco Evangeline, LLC v. Louisiana Tax Commission, 01-2162, p. 5 (La.4/3/02), 813 So.2d 351, 354. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. La. C.C. art. 9. The meaning and intent of a law is determined by a consideration of the law in its entirety, and the court's construction should be consistent with the express terms of law and with the obvious intent of the lawmaker in enacting it. Bridges v. Autozone Properties, Inc., 04-0814 (La.3/24/05), 900 So.2d 784, 799. The best evidence of the legislature's intent is the wording of the statute. State v. Williams, 00-1725 (La.11/28/01), 800 So.2d 790, 800.
Here, the Tribal Council's restriction of its wording to "[n]othing in this Code" makes clear that the codal article applies only to the language of the Code, and not to waivers extraneous to the Code. If, however, we had determined that the codal language required that the Tribal Council pass a "resolution or ordinance" in order to waive sovereign immunity, the Tribal Council passed Resolution 2003-04 authorizing the Chairman to "negotiate and execute ... all necessary additional Agreements with Meyers and/or to execute Work Authorizations" in order to fully implement the Power Program. R. at 524. The Chairman testified that the waivers found in the various contracts and MOU's were necessary to induce the contracting entities to do business with and make substantial financial commitments to the Tribe. R. at 282.
Because the Tribe validly executed waivers of sovereign immunity and expressly subjected itself to the jurisdiction of the district court, we must now determine if the district court erred in not staying the matter to allow the Tribal Court to determine if it had jurisdiction over the non-Indian party, and, if so, decide the merits of the case.
As stated above, the tribal exhaustion doctrine is one based in comity, a discretionary policy, and the decision whether or not to apply the doctrine is up to the discretion of the district court. Here, the merits of the case, a contractual dispute, are, according to the language of the forum selection clauses, to be "interpreted, governed and construed under the laws of the State of Louisiana," rather than by Tribal law. Next, the State of Louisiana has a major interest in contractual disputes involving its corporations and *452 municipalities. Further, the dispute does not involve tribal governance or political integrity. Next, state courts, unlike federal courts, do not have the power to review a tribal court's exercise of jurisdiction over non-members. Finally, the district court carefully considered the arguments of both parties in reaching its decision. Given these facts, we cannot say that the district court abused its discretion.

DECREE
For the foregoing reasons, we reverse the ruling of the court of appeal, reinstate the judgment of the trial court, and remand the matter to the district court for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
CALOGERO, J., additionally concurs and assigns additional reasons.
KIMBALL, J., dissents and assigns reasons.
JOHNSON, J., dissents for reasons assigned by KIMBALL.
VICTORY, J., concurs in the result.
WEIMER, J., dissents and assigns reasons.
CALOGERO, Chief Justice, additionally concurring and assigning additional reasons:
While I agree with and subscribe to the majority opinion and its conclusion that defendant, Coushatta Tribe of Louisiana ("CTOL"), may be sued in Louisiana state court for breach of contract by plaintiff, Meyer & Associates, Inc., I write separately to express my views and cite additional authority for that finding. The "exhaustion of tribal remedies" doctrine discussed by the majority in this case applies only when a case involving a sovereign Indian Tribe has been filed in a federal court, not to state court actions. See, e.g., Michael Minnis & Associates, P.C. v. Kaw Nation, 90 P.3d 1009, 1014 (Ok.Civ.App.2003), citing Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998). In the Kiowa Tribe case, a federally recognized Indian Tribe that had been sued in Oklahoma state court for default on a commercial note moved for dismissal of the case for lack of jurisdiction. The Indian Tribe argued sovereign immunity from suit, and the United States Supreme Court dismissed the suit, finding that the Indian Tribe enjoyed "immunity from suits on contracts," and that sovereignty immunity governed the case because the tribe had not waived that immunity. 523 U.S. at 760, 118 S.Ct. 1700.
The Kiowa Tribe case does not even mention the exhaustion of tribal remedies doctrine in relation to a suit against an Indian Tribe filed in a state court. Based on that fact, I would find that the exhaustion doctrine does not apply in state courts. Rather, the court found that under federal law, "an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." Id. at 754, 118 S.Ct. 1700. The Kiowa Tribe case is therefore authority for the principle that the pertinent question when a state court suit has been filed against an Indian Tribe is whether that tribe waived its sovereign immunity.[1]
*453 The Kiowa Tribe case does not contain any guidance to help a court determine whether an Indian Tribe has waived its sovereign immunity. Nevertheless, authority exists for finding that a sovereign tribe has waived its sovereign immunity via a forum selection clause that is "clear, direct, and unavoidable." Ninigret Development Corp. v. Narragansett Indian Wetuomuck Housing Authority, 207 F.3d 21, 31 (1st Cir.2000), and authority cited therein. As the majority notes, the forum selection clause in the interim agreement at issue in this case provides that the two agreements between the plaintiff and defendant and "amendments thereto shall be interpreted, governed and construed under the laws of the State of Louisiana without regard to applicable conflict of laws provisions," that the tribe "irrevocably consents to the jurisdiction of the courts of the State of Louisiana," that "any dispute arising hereunder shall be heard by a court of competent jurisdiction in the Parish of Allen, or other Parish mutually agreed to," and that the "CTOL specifically waives any rights, claims, or defenses to sovereign immunity it may have as it relates to this Agreement except this wavier is limited at this time to Development phase Services" (emphasis added). Because I believe that the forum selection clause, and particularly the provisions quoted above, constitute a "clear, direct, and unavoidable" waiver of sovereign immunity, I concur in the majority's finding that the tribe is amenable to this state court action. Accordingly, I respectfully concur in the majority opinion.
KIMBALL, J., dissenting.
I respectfully dissent from the majority opinion which finds (1) that the state trial court need not have stayed this matter in accordance with the federal Exhaustion of Tribal Remedies Doctrine[1] (hereinafter, the "Exhaustion Doctrine") in order to allow the Tribal Court to decide whether the Coushatta Tribe had waived its sovereign immunity, and (2) that the Coushatta Tribe waived its sovereign immunity such that it was amenable to suit in the trial court. In my view, the trial court should have stayed or dismissed this matter in accordance with the Exhaustion Doctrine because the Tribal Court should have been allowed to first determine its own jurisdiction and the question of waiver of sovereign immunity. Consequently, I do not reach the issue of whether the Tribe waived its sovereign immunity.
The issue in the instant case is whether Defendant Coushatta Tribe of Louisiana ("CTOL" or "the Tribe") waived its sovereign immunity so as to make it amenable to suit in Louisiana state court. Looking to the plain language of the contract between the Tribe and Plaintiff Meyer & Associates, Inc., ("Meyer"), the Tribe  through Chairman of the Coushatta Tribal Counsel Lovelin Poncho  clearly and unequivocally stated that "the CTOL specifically waives any rights, claims, or defenses to sovereign immunity it may have."[2] Record at 113-14. The essential *454 question to determining the issue of waiver thus necessarily turns on whether Chairman Poncho had the authority to waive the Tribe's sovereign immunity by contractual agreement.
Prior to execution of the contract, the Tribal Council passed Resolution 2003-04, which authorized Chairman Poncho to negotiate and execute all necessary agreements with Meyer and surrounding companies and municipalities as may be required to complete a power plant pursuant to the contract. However, Article 1.1.05 of the Judicial Code of the Coushatta Tribe of Louisiana, entitled "Sovereign Immunity," specifically states: "Nothing in this Code shall be deemed to constitute a waiver of the sovereign immunity of the Coushatta Tribe of Louisiana except as expressly provided herein or as specifically waived by a resolution or ordinance approved by the Tribal Council specifically referring to such." Title 1, § 1.1.05, Coushatta Judicial Code. The question thus becomes (1) whether Resolution 2003-04 actually authorized Chairman Poncho to waive sovereign immunity, and (2) if it did not, whether a resolution or ordinance approved by the Tribal Council is the exclusive means of waiving sovereign immunity in toto, or rather the only means of waiving sovereign immunity within the confines of "this Code." A determination of both questions  which will ultimately determine whether the Tribe waived sovereign immunity and whether the Tribe was therefore subject to the trial court's jurisdiction  thus rests on an interpretation of Article 1.1.05 of the Tribal Code. For the reasons set forth below, I believe that the proper court to first make this determination should be the Coushatta Tribal Court, and that the trial court should never have reached the issue of waiver.

Indian Tribes Generally Enjoy Sovereign Immunity from Commercial Disputes
As a preliminary matter, the Coushatta Tribe is generally immune from suit absent a valid waiver of its sovereign immunity. Indian tribes occupy a unique status under United States law. National Farmers Union Ins. Co. v. Crow Tribe of Indians, 471 U.S. 845, 851, 105 S.Ct. 2447, 2451, 85 L.Ed.2d 818 (1985). They are considered "`domestic dependent nations' that exercise inherent sovereign authority over their members and territories." Oklahoma Tax Comm. v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991). Indian tribes are "distinct, independent political communities" that retain their original natural rights regarding matters of self-government. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 55, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978). Although they no longer possess the full attributes of sovereignty, Indian tribes remain a separate people with the power to make substantive laws to regulate their internal and societal relations and to enforce those laws in their own forums. Id.
While Indian tribes are predominantly autonomous entities, the power of the federal government over Indian tribes is plenary and Congress has the authority to limit, modify or eliminate the powers of local self-government that the tribes otherwise possess. Id. at 56, 98 S.Ct. at 1676. Nonetheless, federal law generally provides significant protection for Indian tribes' individual, territorial and political *455 rights.[3]National, 471 U.S. at 851, 105 S.Ct. at 2451. Specifically, "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." Santa Clara Pueblo, 436 U.S. at 58, 98 S.Ct. at 1677. Consequently, suits against Indian tribes are barred by sovereign immunity absent a clear waiver by the tribe or Congressional abrogation. OK Tax Comm., 498 U.S. at 509, 111 S.Ct. at 909. See also Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc., 523 U.S. 751, 756-58, 118 S.Ct. 1700, 1704-1705, 140 L.Ed.2d 981 (1998) (holding that Indian tribes specifically enjoy sovereign immunity from civil suits on contracts for commercial activities). It is also well settled that a waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." Santa Clara Pueblo, 436 U.S. at 58, 98 S.Ct. at 1677. As such, I would find that the Tribe retains its sovereign immunity absent a valid waiver thereof. However, I dissent from that part of the majority opinion that finds that the Tribe waived its sovereign immunity because, as noted below, I do not believe that the trial court should have reached this issue because I would find that the trial court is subject to the Exhaustion Doctrine.

Under Federal Law, the Coushatta Tribal Court has Jurisdiction to Determine this Dispute
The first question in an Exhaustion analysis is whether the Coushatta Tribal Court has the requisite jurisdiction to decide a case involving a non-Indian. Generally, "absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances." Strate v. A-1 Contractors, 520 U.S. 438, 445, 117 S.Ct. 1404, 1409, 137 L.Ed.2d 661 (1997). Moreover, the inherent sovereign powers of an Indian tribe  those powers that a tribe enjoys apart from and in addition to those powers expressly granted by treaty or statute  generally do not extend to the activities of nonmembers. Montana v. United States, 450 U.S. 544, 565, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981). Nonetheless, "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations." Id. Specifically, a tribe may regulate the activities of (1) nonmembers who enter consensual relationships with the tribe through commercial dealings, contracts, leases or other arrangements, and (2) nonmembers whose conduct within the reservation threatens or has some direct effect on the political integrity, economic security or health or welfare of the tribe. Id. at 565-66, 101 S.Ct. at 1258. In the instant case, it is undisputed that Meyer entered into a consensual, commercial and contractual relationship with the Tribe. Consequently, I would find that, under federal law, the Tribal Court has jurisdiction over Meyer in the instant case.

Under Federal Law, When a Tribal Court's Jurisdiction is Challenged, Tribal Courts First Determine Their Own Jurisdiction, Subject to Federal District Court Review
The next pertinent issue is whether the Tribal Court's jurisdiction can properly be decided by a non-Indian court. I believe that the majority incorrectly determines that the Exhaustion Doctrine is discretionary in nature. While there is technically no binding precedent on this issue regarding state courts, in my view, federal Exhaustion Doctrine jurisprudence requires that federal district courts defer first to tribal courts and allow them to determine *456 their own jurisdiction, subject to federal district court review.
When presented with a conflict between tribal courts and federal district courts regarding the determination of a tribe's sovereign immunity and jurisdiction, the United States Supreme Court has consistently held that:
the existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decision.
National, 471 U.S. at 855-56, 105 S.Ct. at 2453-54. The Supreme Court has therefore concluded that this "examination should be conducted in the first instance in the Tribal Court itself." Id. at 856, 105 S.Ct. at 2454.
In support of its determination, the Court has cited several reasons for applying the Exhaustion Doctrine and requiring tribal courts to first determine their own jurisdiction. First, previous Supreme Court precedent often recognizes Congress' committal to a "policy of supporting tribal self-government and self-determination." Id. Congressional policy therefore favors a jurisprudential rule that "will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge." Id. Second, allowing tribal courts to develop a full record before a federal court addresses any issue promotes the orderly administration of justice in federal courts. Id. The risk of creating a procedural nightmare is therefore minimized when federal courts stay their hands until after tribal courts have had a full opportunity to determine their own jurisdiction and rectify any errors that they may have made. Id. at 856-57, 105 S.Ct. at 2454. Third, the exhaustion of tribal remedies encourages tribal courts to explain to the parties their precise basis for accepting jurisdiction, and also provides other courts with the benefit of tribal court experience in tribal law matters in the event of further judicial review. Fourth, unconditional access to federal courts places such courts "in direct competition with the tribal courts, thereby impairing the latter's authority over reservation affairs." Iowa Mutual Ins. Co. v. LaPlante, 480 U.S. 9, 16, 107 S.Ct. 971, 976, 94 L.Ed.2d 10 (1987) (citing Santa Clara Pueblo, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106). Finally, because tribal courts are best qualified to interpret and apply tribal law, adjudication of such matters by "any nontribal [sic] court" also infringes upon the tribal law-making authority. Id., 107 S.Ct. at 977. As such, the Supreme Court continually holds that "proper respect for tribal legal institutions requires that they be given a `full opportunity' to consider the issues before them and `to rectify any errors.'" Id.
However, the Exhaustion Doctrine is not without limit. Specifically, the Supreme Court has held that exhaustion is not required (1) when an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith, (2) where the action is patently violative of express jurisdictional prohibitions, or (3) where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction. National, 471 U.S. at 856, 105 S.Ct. at 2454, fn. 21. Finally, when the Exhaustion Doctrine does attach, "exhaustion of tribal remedies means that tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts." Iowa, 480 U.S. at 17, 107 S.Ct. at 977. As such, and absent any of the aforementioned exceptions to *457 the Exhaustion Doctrine's applicability, a federal district court is required to stay or dismiss an action when a concurrent action is pending in a tribal court until that concurrent tribal action has been decided by the tribal court and any tribal appellate courts.[4]
Therefore, in my view, the majority is incorrect when it fails to find that, in the instant case, if the state district court were bound by the Exhaustion Doctrine, the state district court would be required to stay or dismiss any proceedings pending a determination by the Tribal Court and subsequent Coushatta appellate courts.
Moreover, if the state district court were bound by the Exhaustion Doctrine, I would further find that none of the enumerated exceptions apply to this case. Meyer suggests in its brief to this court that the Tribal Court might be incompetent or biased in its adjudication, thereby implicating the first exception. However, I believe that this exception will not attach in the instant case. First, the Supreme Court has specifically stated that the "alleged incompetence of tribal courts is not among the exceptions to the exhaustion requirement." Id. at 19, 107 S.Ct. at 978 (the Court further stated that an incompetence exception "would be contrary to the congressional policy promoting the development of tribal courts"). Second, Meyer presents no evidence of bias, and the Supreme Court has declined to permit parties to excuse themselves from the Exhaustion requirement merely by alleging bias. Id. Moreover, the Indian Civil Rights Act provides non-Indians with various protections against unfair treatment in the tribal courts. Id. (citing the Indian Civil Rights Act, 25 U.S.C. § 1302). As such, I do not believe that Meyer can escape the application of the Exhaustion Doctrine by way of the first exception.
Meyer, in an appeal to equity, also suggests that it will have no recourse if the Tribal Court is allowed to decide this case, thereby implicating the third exception. However, again, in my view, this exception will not attach in the instant case. The Supreme Court has stated with absolute clarity that the question of whether a tribal court has civil jurisdiction over a non-Indian is "one that must be answered by reference to federal law and is a `federal question' under § 1331." National, 471 U.S. at 852, 105 S.Ct. at 2452. Therefore, a federal court may review the Tribal Court's decision and can determine whether the Tribal Court "exceeded the lawful limits of its jurisdiction" after the Tribal Court and subsequent Coushatta appellate courts have made their determinations.[5]Id. at 853, 105 S.Ct. at 2452.
Meyer also argues that the Exhaustion Doctrine is not a mandatory jurisprudential rule, but rather an optional matter of comity. The majority opinion also cites the discretionary nature of comity as a reason for declining to apply the Exhaustion Doctrine. In support of this argument, *458 Meyer cites in his brief a footnote in which the Supreme Court noted that exhaustion is "required as a matter of comity, not as a jurisdictional requirement." Iowa, 480 U.S. at 16, 107 S.Ct. at 976, fn. 8. In my view, Meyer's argument and the majority's decision that Exhaustion is a discretionary jurisprudential rule is without merit, and I would find that the Exhaustion Doctrine is mandatory for federal courts. See, e.g., Smith v. Moffett, 947 F.2d 442, 445 (10th Cir.1991) (relying on Granberry v. Greer, 481 U.S. 129, 131, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987), for the proposition that Iowa and National established the Exhaustion Doctrine as "an inflexible bar"); Crawford v. Genuine Parts Co., 947 F.2d 1405, 1407 (9th Cir.1991) ("The requirement of exhaustion of tribal remedies is not discretionary; it is mandatory"). In making this footnoted statement, the Iowa Court connoted merely that a federal district court is not deprived of jurisdiction solely by failure to apply the Exhaustion Doctrine. Drumm v. Brown, 245 Conn. 657, 716 A.2d 50, 56-7 (1998). Rather, I believe that the Exhaustion requirement means that, although the district court has jurisdiction over the action, it cannot exercise that jurisdiction until all tribal remedies have first been exhausted. Id. at 57. The use of the verb "required" when discussing the application of the doctrine as a matter of comity supports this contention. In essence, Exhaustion is "required" as a matter of comity; it is not "required" as a matter of jurisdiction. Regardless, it is still "required."[6] Moreover, the Supreme Court has consistently required lower federal courts to apply the Doctrine, and in its application of the Doctrine, has not suggested that Exhaustion is discretionary. See supra. See also National, 471 U.S. at 857, 105 S.Ct. at 2454 (holding that "exhaustion is required before such a claim may be entertained by a federal court") (emphasis added); Iowa, 480 U.S. at 16-17, 107 S.Ct. at 976 (stating that the "federal policy supporting tribal self-government directs a federal court to stay its hand" and that "proper respect for tribal legal institutions requires that they be given a `full opportunity ...'") (emphasis added). Finally, the enumeration of three distinct exceptions to the Exhaustion Doctrine and the Court's refusal to expand that list strongly suggests that lower federal courts cannot decline to apply the Exhaustion Doctrine in their discretion. National, 471 U.S. at 856, 105 S.Ct. at 2454, fn. 21 (naming exceptions); Iowa, 480 U.S. at 19, 107 S.Ct. at 978 (refusing to expand the list of exceptions). If lower federal courts were allowed to apply the Exhaustion Doctrine at their discretion as a matter of comity, the enumeration of three limited exceptions would be meaningless. Consequently, I do not believe that the Exhaustion Doctrine is as optional in nature as Meyer or the majority opinion suggests, and that federal courts are in fact required to apply Exhaustion before exercising jurisdiction.
Therefore, in the instant case, if the state district court were bound by the Exhaustion Doctrine, I believe that the state district court would have to either stay or dismiss the action currently before it because there is a concurrent proceeding pending in the Tribal Court. Therefore, in my opinion, the majority is incorrect to dismiss the Exhaustion Doctrine as optional in nature. Consequently, the only question remaining before this court is whether the state district court is required to apply the federal Exhaustion Doctrine.

*459 While There is No Binding Precedent Requiring State Courts to Apply the Exhaustion Doctrine, the Courts of This State Should Apply the Doctrine

While the United States Supreme Court has never explicitly stated that state courts are subject to the federal Exhaustion Doctrine, the vast majority of jurisprudential evidence supports the conclusion that this court should find that Louisiana state courts are subject to the Exhaustion Doctrine. Previous Supreme Court decisions, the reasons behind those decisions and the arguments presented in a well-reasoned Connecticut Supreme Court case convince me that the courts of this state should be bound by the Exhaustion Doctrine. I therefore dissent from the majority opinion that finds that Exhaustion does not apply to state courts.
Previous United States Supreme Court decisions consistently connote  often in very clear language  that state courts are subject to the Exhaustion Doctrine. In Worcester v. State of Georgia, the Supreme Court held that a Georgia law that forbade the Cherokee Nation from having courts was invalid. Worcester v. State of Georgia, 31 U.S. 515, 6 Pet. 515, 8 L.Ed. 483 (1832). Writing for the Court, Chief Justice Marshall noted that the laws of Georgia "can have no force" over an Indian tribe and that the "whole intercourse between the United States and this nation is... vested in the government of the United States." Id. (impliedly abrogated in part by Nevada v. Hicks, 533 U.S. 353, 361-62, 121 S.Ct. 2304, 2311, 150 L.Ed.2d 398 (2001), noting that state laws can now have some force over Indian tribes). In subsequent years, although the Supreme Court has "modified these principles in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized ... the basic policy of Worcester has remained." Williams v. Lee, 358 U.S. 217, 219, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959). "Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them."[7]Id. at 220, 79 S.Ct. at 271. In my view, the state court's action in this case has infringed on the right of the Tribe to make its own laws and be ruled by them.
Over time, the Supreme Court has become more explicit in its wording. In Fisher v. Dist. Court of Sixteenth Jud. Dist. of Montana, the Supreme Court stated that state court jurisdiction "plainly would interfere with the powers of self-government conferred upon the Northern Cheyenne Tribe and exercised through the Tribal Court." Fisher v. Dist. Court of Sixteenth Jud. Dist. Of Montana, 424 U.S. 382, 387, 96 S.Ct. 943, 947, 47 L.Ed.2d 106 (1976). Furthermore, in its Iowa decision, the Court plainly stated that the "federal policy favoring tribal self-government operates even in areas where state control has not been affirmatively pre-empted by federal statute." Iowa, 480 U.S. at 14, 107 S.Ct. at 975. In Iowa, the Court reaffirmed its statement in Williams that "the question has always been whether the *460 state action infringed on the right of the reservation Indians to make their own laws and be ruled by them." Id. (citing Williams, 358 U.S. at 220, 79 S.Ct. at 271). The Iowa Court stated that "[a]djudication of such matters by any nontribal [sic] court also infringes upon tribal lawmaking authority, because tribal courts are best qualified to interpret and apply tribal law." Id. at 16, 107 S.Ct. at 977. In my opinion, the Court's use of the phrase "any nontribal [sic] court" connotes that both federal and state court adjudication of such matters would necessarily infringe on tribal sovereignty. The Court confirmed this connotation, again citing Williams and Fisher, when it stated that, "[i]f state-court jurisdiction over Indians or activities on Indian lands would interfere with tribal sovereignty and self-government, the state courts are generally divested of jurisdiction as a matter of federal law." Id. at 15, 107 S.Ct. at 976 (citing Fisher and Williams). In this case, the state trial court purports to determine whether the Tribe has waived its sovereign immunity and whether the Tribal Court has jurisdiction to hear a case. I believe that this exercise of state court jurisdiction necessarily interferes with Tribal sovereignty and self-government and that the state court is therefore divested of jurisdiction as a matter of federal law. Finally, in its most recent case, the Supreme Court stated that "tribal immunity is a matter of federal law and is not subject to diminution by the States." Kiowa Tribe, 523 U.S. at 756, 118 S.Ct. at 1703.
Therefore, based on the governing Supreme Court jurisprudence and contrary to the majority's decision, I believe that the Supreme Court contemplated that the Exhaustion Doctrine would apply to state courts as well as federal courts. Moreover, while the Court cannot be said to have explicitly held that the Exhaustion Doctrine applies to the states under the Supremacy Clause, I would find that the five aforementioned reasons for subjecting the federal courts to the Exhaustion Doctrine enumerated by the Supreme Court in National and Iowa apply with equal force to state courts. For example, Congress' committal to a policy of supporting tribal self-government and self-determination is hindered by both federal and state court adjudication of Indian litigation. Moreover, allowing tribal courts to develop a full record before a non-tribal court addresses an issue promotes the orderly administration of justice in both federal and state courts. Also, I believe the Exhaustion Doctrine encourages tribal courts to explain the basis for accepting jurisdiction and provides reviewing courts with the benefit of tribal court experience. Furthermore, the Supreme Court has held that unconditional access to the federal forum places it in direct competition with the tribal courts, thereby impairing the latter's authority over reservation affairs. Certainly the same can be said of unconditional access to the state forum. See Klammer v. Lower Sioux Convenience Store, 535 N.W.2d 379, 381 (Ct.App.Minn. 1995).[8] In the instant case, the facts *461 prove the accuracy of this assertion: here, the state court is competing with the Tribal Court and therein impairing the latter's authority over reservation affairs. Specifically, the state court is interfering with the Tribal Court's ability to interpret its own Tribal Code. Finally, as noted above, adjudication of such matters by any non-tribal court  whether it be federal or state  necessarily infringes on tribal law-making authority. Consequently, even if the decisions of the Supreme Court have yet to explicitly apply the Exhaustion Doctrine to state courts, I would find that the rationale behind that Doctrine demands that this court apply Exhaustion to Louisiana state courts.
Such a decision would not be anomalous. In a well-reasoned and extensive decision, the Connecticut Supreme Court similarly decided that the Exhaustion Doctrine applies to state courts. Drumm, 245 Conn. 657, 716 A.2d 50 (1998). In Drumm, the plaintiffs were former employees of a tribe-owned casino who filed suit against the tribe in state court. Id. at 52. The defendants, citing the plaintiffs' failure to exhaust tribal remedies, moved to dismiss or stay the state court proceedings. Id. at 54. The trial court granted the defendants' motion and dismissed the plaintiffs' action. Id.
The Connecticut Supreme Court found that the Exhaustion Doctrine applies to state courts. It noted that United States Supreme Court cases indicate that the doctrine is based primarily upon "respect for a substantive `federal policy supporting tribal self-government'" that emanates from numerous federal statutes. Id. at 62. Although it acknowledged that the Supreme Court does not conclusively indicate whether the Exhaustion Doctrine is substantive federal law, which is binding on state courts pursuant to the Supremacy Clause, the Drumm court noted that there are "strong suggestions" that the Doctrine is in fact substantive in nature. Id. at 62-63 (citing the Supreme Court's use of mandatory language in Iowa and National: federal policy "required" Exhaustion Doctrine, federal policy "directs" abstention). The Drumm court also found that the Doctrine was inseparable from the federal policy and therefore probably formed an "integral, albeit interstitial and court-created, component of the law embodying federal policy supporting tribal self-government and self-determination." Id. at 63. Moreover, because federal common law as articulated by Court decisions is part of federal law, the Drumm court concluded that the Exhaustion Doctrine is likely applicable to the states. Id. I believe that such a conclusion is logical under the Supremacy Clause, especially given the federal law's complete domination of this area of law. Finally, the Drumm court held that, regardless of the Supreme Court's intent regarding the application of the Exhaustion Doctrine to state courts, Connecticut state courts would apply the Exhaustion Doctrine out of deference and for the same reasons that the Supreme Court made the federal courts subject to Exhaustion.[9]Id. at 63-64. I agree, and believe that Louisiana state courts should similarly apply the Exhaustion Doctrine out of deference and for the same reasons articulated by the Supreme Court.
Therefore, whether we choose to base our decision on the highly persuasive language employed by the Supreme Court in *462 its decisions on the matter, the reasons behind those decisions or the logical arguments presented by the Drumm court, in my view, the conclusion is the same: Louisiana state courts should be subject to the Exhaustion Doctrine. Consequently, I respectfully dissent from the majority's opinion that the Exhaustion Doctrine is not applicable to state courts. For this reason, I do not believe that the trial court should have reached the issue of waiver of sovereign immunity.

Conclusion
Under applicable federal law, the Coushatta Tribe enjoys sovereign immunity from suit in the instant case. Under the same federal law, the Coushatta Tribal Court has jurisdiction over Meyer to determine the issue in this case. Moreover, when a tribal court's jurisdiction is challenged, like the state district court has challenged the Coushatta Tribal Court's jurisdiction in the instant case by entertaining Meyer's state court proceeding, that same federal law requires that federal district courts allow the tribal court to first determine its own jurisdiction. The primary issue, therefore, is whether the state district court should similarly be subject to the federal Exhaustion Doctrine. For the foregoing reasons, and although the United States Supreme Court does not explicitly require such, I would find that Louisiana state courts are subject to the federal Exhaustion Doctrine and that the trial court should not have reached the issue of waiver.
In my view, this case should be remanded to the trial court with an order to stay or dismiss any state court proceedings when and until the Coushatta Tribal Court and any Coushatta appellate court has rendered its decision and exhausted its judicial process.
WEIMER, J., dissenting.
I respectfully dissent.
The initial question in this matter is whether there was authority to include various clauses, including a waiver of sovereign immunity, in the agreement with Meyer & Associates, Inc. This question involves an evaluation of tribal law. Because I believe this threshold question involving tribal law should be resolved by the tribal court, I would find the tribal court had jurisdiction to initially determine the validity of the agreements at issue.
If the tribal court determines there was authority to effectuate the agreements, the matter can then be returned to state court.
NOTES
[1] In Kiowa Tribe, the United States Supreme Court also noted that the doctrine of tribal immunity "developed almost by accident," 523 U.S. at 755, 118 S.Ct. 1700, and that reasons exist "to doubt the wisdom of perpetuating the doctrine" for the purpose of "safeguarding tribal self-governance" in "our interdependent and mobile society." Id. at 758, 118 S.Ct. 1700. The court further stated its belief that in the modern economic context, "immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims." Id. Nevertheless, the court indicated that despite a possible "need to abrogate tribal immunity, at least as an overarching rule," it is Congress that "is in a position to weigh and accommodate the competing policy concerns and reliance interests." Id. at 759.
[1] For the purposes of this dissent, I will identify the rule by which the Supreme Court requires federal courts to exhaust tribal remedies before exercising their jurisdiction as the "Exhaustion of Tribal Remedies Doctrine."
[2] In addition, the CTOL  again through Chairman Poncho  agreed to "irrevocably consent to the jurisdiction of the courts of the State of Louisiana" and to try any dispute arising under the agreement in "a court of competent jurisdiction in the Parish of Allen, or any other Parish mutually agreed to." Record at 113-14.
[3] This federal law is garnered from statute, treaty, administrative regulations and judicial decisions. National, 471 U.S. at 851, 105 S.Ct. at 2451.
[4] "Whether the federal action should be dismissed, or merely held in abeyance pending the development of further Tribal Court proceedings, is a question that should be addressed in the first instance by the District Court." National, 471 U.S. at 857, 105 S.Ct. at 2454.
[5] The federal district court's scope of review is limited by its findings regarding jurisdiction. If the federal court finds that the tribal court had jurisdiction, proper deference to the tribal court precludes re-litigation of factual issues raised in and determined by the tribal court. Iowa, 480 U.S. at 19, 107 S.Ct. at 978. If, however, the federal court finds that the tribal court lacked jurisdiction, the tribal court's factual determinations are subject to review. Id. See also Duncan Energy Co. v. Three Affiliated Tribes of the Fort Berthold Reservation, 27 F.3d 1294, 1300 (8th Cir.1994).
[6] The Supreme Court also likened the Exhaustion Doctrine to abstention, a similar doctrine that is also required, but not jurisdictional in nature. Iowa, 480 U.S. at 16, 107 S.Ct. at 976, fn. 8.
[7] The Court also noted that Congress has expressly granted the states the jurisdiction that Worcester denied to them when Congress has wished the states to exercise such jurisdiction. Williams, 358 U.S. at 221, 79 S.Ct. at 271 (citing various grants of jurisdiction to the states, e.g., 25 U.S.C. § 232-33, which granted New York courts broad jurisdiction over certain Indian civil and criminal affairs). In Williams, the Court found that there could be "no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves." Id. at 223, 79 S.Ct. at 272.
[8] In Klammer, the state district court held that exercise of its jurisdiction would not interfere with the Indian tribe's self government and would not impinge on its sovereignty, and also found that application of the Exhaustion Doctrine would deny plaintiff an opportunity to be heard in any court. Klammer, 535 N.W.2d at 380. Similar to the instant case, the state district court in Klammer determined the issue of tribal court jurisdiction by analyzing the tribe's sovereign immunity and interpreting for itself provisions of the tribal code, and found that the tribe in Klammer waived its immunity by resolution. Id. at 382. The court of appeal reversed the district court, applied the Exhaustion Doctrine, found that "unconditional access to state court would similarly impair the tribal court's authority," and ordered that the tribal court be given the opportunity to first evaluate its own jurisdiction. Id. at 381-82.
[9] The Drumm court also cited the well recognized "plenary and exclusive [federal] power over Indian affairs" yet another reason to defer to the Supreme Court's Doctrine. Id.